# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Portia A. Boulger,

        Plaintiff,

    v.                                **Case No.: 2:17-cv-186**
                                        **JUDGE GEORGE C. SMITH**
                                        **Magistrate Judge Deavers**

James H. Woods,

        Defendant.

## OPINION AND ORDER

This matter is before the Court upon two motions by Defendant James Woods: (1) a Motion for Judgment on the Pleadings, filed June 7, 2017 (Doc. 7); and (2) a Motion for Summary Judgment, or in the Alternative, Motion for Dismissal, filed August 15, 2017 (Doc. 16). The motions are both fully briefed and ripe for disposition. For the following reasons, Woods's Motion for Summary Judgment, or in the Alternative, Motion for Dismissal is **DENIED** and Woods's Motion for Judgment on the Pleadings is **GRANTED**.

## I.      FACTUAL BACKGROUND

The relevant facts occurred against the backdrop of the 2016 U.S. Presidential campaign. The parties are Plaintiff Portia Boulger, "a very active volunteer and pledged convention delegate for U.S. Senator Bernie Sanders (D-Vt)" for the Democratic Party's nomination, and Defendant James Woods, "a well-known movie actor and producer who has appeared in a number of films including *The Way We Were, The Onion Field,* and *Once Upon a Time in America.*" (Doc. 1, Compl. ¶¶ 2, 6).

On Friday, March 11, 2016, the campaign of Donald J. Trump, then a candidate for the Republican nomination for President, held a rally in Chicago, Illinois. (*Id.* ¶ 7). That evening, the Chicago Tribune newspaper posted on its Twitter account a photograph of a woman at the rally, wearing a Trump T-shirt, and "giving a Nazi salute—the well-known 'Heil Hitler' salute with her right hand raised straight up." (*Id.* ¶ 8). On Saturday, March 12, the Twitter user @voxday posted the photograph, together with a photograph of Boulger and caption identifying Boulger as "Organizer (Women for Bernie)." (Doc. 7, PAGEID #61, screenshot). The two photographs and caption were accompanied by the (false) statement, "The 'trump Nazi' is Portia Boulger, who runs the Women for Bernie Sanders Twitter account. It's another media plant.'" (Doc. 7, PAGEID #61).

Within minutes of @voxday's tweet, Defendant James H. Woods tweeted the same two photographs and caption along with the comment, "So-called #Trump 'Nazi' is a #BernieSanders agitator/operative?" (*Id.* ¶ 12; Doc. 9-1, screenshot). Woods's Twitter account has more than 350,000 followers and the tweet in question was re-tweeted more than 5,000 times, including by Mr. Trump's son, Donald Trump, Jr. (Doc. 1, Compl. ¶¶ 13, 19).

Later that same Saturday, the woman who gave the salute at the rally was correctly identified by various newspapers and twitter users as Birgitt Peterson of Yorkville, Illinois. (Doc. 1, Compl. ¶¶ 15, 17–18). Woods then tweeted, still on that same Saturday, that "Various followers have stated that the Nazi Salute individual and the #Bernie campaign woman are NOT the same person. #Chicago #Trump." (Doc. 7, PAGEID #62, screenshot). However, Woods did not delete his earlier tweet containing the photographs of Peterson and Boulger. (Doc. 1, Compl. ¶ 19).

On March 22, 2016, counsel for Boulger wrote to counsel for Woods, requesting that Woods delete the tweet and issue, through Twitter, a retraction and apology. (*Id.* ¶ 21). Woods's counsel denied that the tweet was defamatory but asked Woods to delete the tweet, which he did on March 22, 2016. (*Id.* ¶ 22). On March 23, 2016, Boulger's counsel again contacted Woods counsel and demanded a public retraction and apology. (*Id.* ¶ 23). On March 23, 2016, Woods posted three new tweets:

> (i) "I have an opportunity to clarify something I challenged immediately when it hit Twitter. Portia A. Boulger was NOT the 'Nazi salute lady.'"

> (ii) "Ms. Boulder [sic] has reached out to me and asked me to use my many followers to stop people from harassing her. I am more than happy to do so."

> (iii) "Though she supports @BernieSanders, I am happy to defend her from abuse. I only wish his supporters would do the same for other candidates."

(*Id.* ¶ 24).

During the period from March 12–March 23, 2016, while Woods' tweet remained posted on his Twitter account, Boulger received hundreds of obscene and threatening messages, including death threats. (*Id.* ¶ 26). Boulger has also received telephone calls at her residence, continuing through the time she filed her Complaint, from callers who hung up when the phone was answered. (*Id.* ¶ 27).

## II.     PROCEDURAL HISTORY

Boulger filed her Complaint against Woods on March 3, 2017, asserting two claims: defamation and invasion of privacy. (Doc. 1). On June 1, 2017, Boulger filed a motion for extension of time to complete service of process on Woods, as the 90 days for completion of service allowed by Federal Rule of Civil Procedure 4(m) was about to expire. (Doc. 4). Boulger described in her motion the efforts her counsel had undertaken in attempting to serve Woods:

- On March 8, 2017, Boulger's counsel contacted Michael Weinstein, the lawyer who had acted for Woods when Boulger's counsel requested a retraction of and

apology for the March 12, 2016 tweet. Boulger's counsel asked Weinstein whether he would accept service of the summons and complaint on behalf of Woods. (*Id.* at 4).

- On March 15, 2017, Weinstein responded by stating he was not authorized to accept service and was not sure what lawyer would be defending the case; but that "if I am ultimately retained for the case, I'll be able to address it with you then." (*Id.*; Doc. 4-3, email exchanges).

- Boulger's counsel used the database service PeopleFinder to attempt to find an address for Woods in Los Angeles. The database returned a last known address for Woods on Wilshire Boulevard in Beverly Hills, California. On March 23, 2017, Boulger's counsel mailed a copy of the Summons, Complaint, Notice of Lawsuit and Request to Waive Service, two copies of the Waiver of Service form and a self-addressed stamped envelope to the Wilshire Boulevard address. That package was returned marked "Addressee Unknown." (Doc. 4 at 4).

- On April 12, 2017, Weinstein confirmed that he had not been retained by Woods in this matter and was not authorized to accept service. (*Id.*; Doc. 4-3, email exchanges).

- Also on April 12, 2017, Patrick Kasson contacted Boulger's counsel by telephone, stating that he had been retained to represent Woods in this matter. Kasson asked Boulger's counsel to send him the Complaint, Notice of Lawsuit and Request to Waive Service, and the Waiver of Service form. Boulger's counsel provided all of these documents to Kasson that same day via email. (Doc. 4 at 4; Doc. 4-5, email exchanges).

- On April 13, 2017, Kasson emailed Boulger's counsel and stated that he had not agreed to accept service on behalf of Woods as "I am not authorized to do that yet. I asked that you send over a waiver form." (*Id.*).

- Boulger's counsel followed up with Kasson via email on April 24, 2017, but received no response. (Doc. 4 at 5).

- On May 8, Boulger's counsel spoke with Kasson on the phone, and Kasson stated that Woods had not authorized him to accept service. Boulger asserts, but Woods denies, that Kasson stated during this phone call that he would try to talk Woods out of his refusal to authorize acceptance of service in the next few days. (*Id.*; Doc. 20, Reply in Supp. of Mot. for Summ. J. at 9).

- On May 25, 2017, Boulger's counsel spoke with Kasson on the phone. Kasson stated that Woods would not authorize Kasson to accept service; that Woods planned to file an answer and motion for judgment on the pleadings; and that Woods would raise the defense of insufficient service in the answer. (*Id.*).

- On May 30, 2017, Boulger's counsel spoke with Kasson on the phone again. Kasson stated that Woods would not oppose Boulger's motion for an extension of time to complete service, and that Kasson did not have a valid address for Woods to which a waiver request could be sent. (*Id.*).

The Court granted Boulger's request for an extension of time on June 6 and ordered that she complete service on Woods no later than August 7, 2017. (Doc. 5). The following day, June 7, 2017, Woods filed an Answer to the Complaint (including affirmative defenses of insufficient service of process and lack of personal jurisdiction) and a Motion for Judgment on the Pleadings (arguing that Boulger's allegations failed to state a viable claim for either defamation or invasion of privacy because Woods's tweet was not a statement of fact). (Docs. 6–7). The parties also jointly filed a Rule 26(f) report on July 11, 2017, which stated that "Defendant Woods has not been served. In addition, Defendant Woods contests personal jurisdiction. Plaintiff contends that Defendant has waived lack of personal jurisdiction and insufficient service by failing to include it in his Rule 12 Motion for Judgment on the Pleadings." (Doc. 12 at 2).

On August 15, 2017, eight days after Boulger's extended time to complete service expired, Woods filed a Motion for Summary Judgment, or in the Alternative, Motion for Dismissal due to Boulger's failure to perfect service within the time permitted by the Court. (Doc. 16). Boulger asserts that Woods has waived his defenses of insufficient service of process and lack of personal jurisdiction by failing to raise those defenses in his previous Motion for Judgment on the Pleadings under Rule 12(c). (Doc. 19). The Motion for Summary Judgment and Motion for Judgment on the Pleadings have now been fully briefed and are ripe for decision.

## III.    DISCUSSION

Although Woods's second motion is styled as a "Motion for Summary Judgment, or in the Alternative, Motion for Dismissal," its substance is clearly that of a motion to dismiss for insufficient service of process under Federal Rule of Civil Procedure 12(b)(5). The Sixth Circuit

has noted that summary judgment is an "improper" vehicle to challenge service of process "because the defense 'involves a matter in abatement and does not go to the merits of the action.'" *King v. Taylor*, 694 F.3d 650, 657 n.2 (6th Cir. 2012) (quoting *United States v. Marple Cmty. Record, Inc.,* 335 F. Supp. 95, 101 (E.D. Pa. 1971)). "Nevertheless, when the defense has been preserved in an answer and is later raised in a pre-trial motion, a court will look past the label chosen by the movant and treat the motion as a request for a ruling on the defense made under . . . Rule 12(i)." *Id.* Because the basis for Woods's summary judgment motion is not that he is entitled to judgment on the merits, but that Plaintiff's failure to perfect service deprives this Court of jurisdiction over Woods's person, the Court will construe the motion as seeking dismissal under Rule 12(b)(5).[1]

Without proper service of process, consent, waiver, or forfeiture, a court may not exercise personal jurisdiction over a named defendant. *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.,* 526 U.S. 344, 350 (1999). And in the absence of personal jurisdiction, a federal court is "powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 584 (1999). Because Woods's second motion implicates the Court's power to decide the earlier motion for judgment on the pleadings, the Court will consider the motion to dismiss for insufficient service of process first.

---

[1] While Woods derivatively challenges personal jurisdiction as a result of Boulger's failure to effect service of process, he does not otherwise challenge this Court's jurisdiction over his person. (Doc. 20, Reply in Supp. of Mot. for Summ. J. at 5) (noting that Boulger's "failure to properly serve Mr. Woods triggers Mr. Woods' lack of personal jurisdiction defense").

## A. Dismissal for insufficient service of process

### 1. Standard of review

"Due process requires proper service of process for a court to have jurisdiction to adjudicate the rights of the parties." *O.J. Distrib., Inc. v. Hornell Brewing Co., Inc.,* 340 F.3d 345, 353 (6th Cir. 2003). Federal Rule of Civil Procedure 4(m) provides:

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

A "plain reading" of the Rule "shows that a district court generally possesses the discretion to dismiss a complaint or to allow service to be perfected within a specified time, regardless of the absence of good cause, whenever a plaintiff fails to perfect service within [90] days after filing a complaint." *Greene v. Venatter*, No. 2:13-CV-00345, 2014 WL 559154, at *2 (S.D. Ohio Feb. 11, 2014) (Smith, J.).[2] However, if a plaintiff shows good cause for failure to timely complete service, the court's discretion is removed. "Upon a showing of good cause, a district court *shall* extend the time for service." *Id.*

The plaintiff "bears the burden of perfecting service of process and showing that proper service was made." *Enyart v. Franklin Cty.*, No. 2:09-CV-687, 2013 WL 1915099, at *2 (S.D. Ohio May 7, 2013) (King, M.J.) (quoting *Sawyer v. Lexington–Fayette Urban County Gov't,* No. 00–6097, 18 Fed. App'x 285, 287 (6th Cir. 2001)). If the Plaintiff fails to do so, Rule 12(b)(5) allows the defendant to seek dismissal by motion. Because the pleadings themselves will typically shed no light on service issues, motions to dismiss need not be treated as motions for

---

[2] Prior to the 2015 amendments to the Federal Rules, plaintiffs were permitted 120 days to complete service. As the principles underlying Rule 4(m) remain unchanged, cases construing the 120-day deadline under the previous version of the Rule remain relevant to understanding post-2015 Rule 4(m) considerations.

summary judgment even if they are supported by affidavits or other evidence outside the pleadings. *Id.*

### 2.    Plaintiff's showing of good cause

Boulger concedes that, although she was already granted an additional sixty days to complete service on Woods, service has not yet been made. (Doc. 19, Mem. in Opp. to Mot. for Summ. J. at 8). Nor has Boulger documented or described any efforts taken by her or her counsel to serve Woods since the time the extension was granted. The Court would be inclined to nevertheless find that Boulger has shown good cause for failure to complete service due to the actions of Woods.

It certainly appears that Woods is fully aware of the lawsuit, has retained a lawyer to represent him in this matter, has received a copy of the Complaint (as evidenced by his responding Answer), and is willing to engage with the substance of the allegations (as evidenced by his Motion for Judgment on the Pleadings seeking a decision on the merits). His simultaneous refusal to waive service, to authorize his lawyer to accept service, or to provide his lawyer with an address where he may be served smacks of intentional evasion, a well-settled ground for denying dismissal under Rule 12(b)(5). *Friedman v. Estate of Presser*, 929 F.2d 1151, 1157 (6th Cir. 1991); Fed. R. Civ. P. 4, 1993 Advisory Committee Notes, subdivision (m). *See also Golden Oldies, Ltd. v. Scorpion Auction Grp., Inc.*, 199 F.R.D. 98, 100 (E.D.N.Y. 2001) (defendant's refusal to leave his counsel with any contact information was evidence of intentional evasion of service); *United States v. Miller*, No. 07-11700, 2007 WL 3173362, at *3 (E.D. Mich. Oct. 29, 2007) (quoting *TRW, Inc. v. Derbyshire,* 157 F.R.D. 59, 60 (D.Colo. 1994)) ("The rules governing service of process are not designed to create an obstacle course for the plaintiffs to navigate, or a cat-and-mouse game for defendants who are otherwise subject to the court's jurisdiction.").

Woods denies he engaged in any "gamesmanship" because he twice notified Boulger that service was not yet complete, and because Boulger could have further attempted service through different means, such as "by personally delivering a copy of the summons and complaint to the defendant personally, leaving a copy at the defendant's dwelling or usual place of abode with someone of suitable age and discretion who resides there, or delivering a copy to an agent authorized to receive service of process" under Fed. R. Civ. P. 4(e)(2)(A)–(C). (Doc. 20, Reply in Supp. of Mot. for Summ. J. at 6–7 n.2, 10). But Woods himself made all of these methods impossible by refusing to provide his lawyer with an address where he may be served or to authorize his lawyer to accept service on his behalf.

Ultimately, however, the Court need not decide whether Woods has intentionally evaded service or whether Boulger has otherwise shown good cause. Boulger argues that regardless of her efforts, Woods has waived the defenses of insufficient service of process and lack of personal jurisdiction as provided by Rule 12(g)–(h) by failing to raise those defenses in his earlier Motion for Judgment on the Pleadings under Rule 12(c). As explained below, the Court finds that Woods has indeed waived these defenses—though not by his failure to comply with Rule 12, but by voluntarily submitting to the Court's jurisdiction through his conduct.

### 3. Waiver under Rule 12

Federal Rule of Civil Procedure 12(g)(2) provides, "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Additionally, Rule 12(h)(1) provides that "[a] party waives any defense listed in Rule 12(b)(2)–(5) by omitting it from a motion in the circumstances described in Rule 12(g)(2)."

The effect of these two provisions is that "a defendant who files a motion under Rule 12, yet fails to raise in that motion the defense of insufficient service of process, forever 'waives'

that defense." *King*, 694 F.3d at 656. Boulger contends that Woods filed a motion under Rule 12—his Motion for Judgment on the Pleadings under Rule 12(c)—and failed to raise in that motion the defense of insufficient service of process or lack of personal jurisdiction; therefore he has forever waived those defenses. (Doc. 19, Mem. in Opp. to Mot. for Summ. J. at 2).

Woods argues that he is barred from filing successive Rule 12 motions under Rule 12(g)(2) only if the first motion is a *pre-answer* motion. (Doc. 16, Mot. for Summ. J. at 4). Because his Motion for Judgment on the Pleadings followed the filing of his Answer to the Complaint, Woods contends the waiver rules in Rules 12(g)(2) and 12(h)(1) do not apply to him. (*Id.*). "The problem with this argument is its complete lack of textual support." *Mississippi ex rel. Hood v. Entergy Mississippi, Inc.*, No. 3:08-CV-780-CWR-LRA, 2017 WL 2973998 at *2 (S.D. Miss. July 11, 2017). As correctly pointed out by Boulger, Rule 12(g)(2) applies to any initial motion "under this rule"—i.e., Rule 12 as whole—and makes no distinction between pre-answer and post-answer motions. *Id.*; *King*, 694 F.3d at 656 (insufficient service defense is waived by a prior "motion under Rule 12").

Nor does Rule 12(g)(2)'s exemption for the provisions of Rule 12(h)(2) create a safe harbor for Woods. (Doc. 20, Reply in Supp. of Mot. for Summ. J. at 2–3). Rule 12(g)(2)'s prohibition on successive motions applies "except as provided in Rule 12(h)(2)." Rule 12(h)(2) provides that "[f]ailure to state a claim upon which relief can be granted . . . may be raised by a motion under Rule 12(c)." Reading Rule 12(g)(2) and Rule 12(h)(2) together thus results in the unremarkable conclusion that a party may file a Rule 12(c) motion for judgment on the pleadings at a later stage in the litigation, even if the party has filed a previous motion under Rule 12. That is, Rule 12(c) motions are excepted from the bar against successive motions when the Rule 12(c) motion is the *second* motion, not the first.

This exception is consistent with the "[t]he obvious purpose of Rule 12(c) [ ] to save time and expense in cases wherein the ultimate facts are not in dispute." *Ulen Contracting Corp. v. Tri-Cty. Elec. Co-op.*, 1 F.R.D. 284, 285 (W.D. Mich. 1940). Woods's reading, in contrast, would allow a party to assert any Rule 12 defense at any point in the litigation, so long as that party previously filed a Rule 12(c) motion at the outset. This result would clearly conflict with Rule 12's purpose of "avoiding the piecemeal consideration of pretrial motions." *Rauch v. Day & Night Mfg. Corp.,* 576 F.2d 697, 701 (6th Cir. 1978).

In sum, "failure to include an available personal jurisdiction defense in a party's first Rule 12 motion, whether a Rule 12(b) motion to dismiss or a Rule 12(c) motion for judgment on the pleadings, waives the defense." *Hood*, 2017 WL 2973998 at *2; *accord Broussard v. Tex. Dep't of Criminal Justice*, No. H-04-1059, 2006 WL 1517532, at *8 (S.D. Tex. May 30, 2006) (finding personal jurisdiction defense waived when not raised in motion for judgment on the pleadings).

However, Woods has one last argument against waiver under Rule 12: that the defense of insufficient service of process was not "available" at the time of his Motion for Judgment on the Pleadings (on June 7, 2017) because the time permitted by the Court for Boulger to complete service (until August 7, 2017) had not yet elapsed. (Doc. 16, Mot. for Summ. J. at 5). Waiver under Rule 12 is possible only for "a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). And "a motion to dismiss on the basis of improper service made during the period for service may properly be denied as premature." *King*, 694 F.3d at 661. As explained by the Supreme Court, "the [90]–day provision [of Rule 4(m)] operates not as an outer limit subject to reduction, but as an irreducible allowance. . . . The Federal Rules thus convey a clear message: Complaints are not to be dismissed if served within

[90] days, or within such additional time as the court may allow." *Henderson v. United States*, 517 U.S. 654, 661, 663 (1996). *See also* Motions to Dismiss—Insufficiency of Process and Service of Process, 5B Fed. Prac. & Proc. Civ. § 1353 (3d ed.) ("It is premature to make a motion challenging service until the plaintiff's time to effect service, as governed by Rule 4, has expired.").

Because the time for Boulger to complete service had not yet elapsed when Woods filed his Motion for Judgment on the Pleadings, the defense of insufficient service of process (and the corresponding personal jurisdiction defense) were not "available" to Woods at that point in time. Accordingly, Woods did not waive these defenses by operation of Rule 12.

### 4. **Waiver by conduct**

Rule 12 is not the only mechanism by which defenses of insufficient service of process and lack of personal jurisdiction may be waived, however. "The requirement that a court have personal jurisdiction is a due process right that may be waived either explicitly or implicitly. The actions of the defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary or not." *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 905 (6th Cir. 2006) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana,* 162 F.3d 724, 729 (2d Cir.1998) and *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704–05 (1982)). Submissions, appearances, and filings that give "[P]laintiff a reasonable expectation that [Defendants] will defend the suit on the merits or must cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking" result in waiver of a personal jurisdiction defense. *Gerber v. Riordan*, 649 F.3d 514, 519 (6th Cir. 2011) (citing *Bauxites*, 456 U.S. at 704). In other words, "[p]arties that choose to litigate a case actively on the merits surrender the right to object to the lack of personal jurisdiction." *Nat'l Feeds, Inc. v. United Pet Foods, Inc.*, 118 F. Supp. 3d 972, 973 (N.D. Ohio 2015) (citing *Days Inns*, 445 F.3d at 905).

"Determining what constitutes waiver by conduct is more art than a science to be sure, and there is no bright line rule." *State Auto Ins. Co. v. Thomas Landscaping & Const., Inc.*, No. 2:09-CV-735, 2011 WL 3475376, at *6 (S.D. Ohio Aug. 9, 2011) (Smith, J.), *aff'd in relevant part,* 494 F. App'x 550 (6th Cir. 2012) (quoting *Pruco Life Ins. Co. v. Wilmington Trust Co.,* 616 F. Supp. 2d 210, 216 (D.R.I. 2009)). The Court considers all relevant circumstances in deciding whether a party has waived personal jurisdiction. *King*, 694 F.3d at 659.

Though there may be no "bright line rule" in evaluating waiver by conduct, this case does not present an especially close question. Although Woods did raise the defenses of insufficient service of process and lack of personal jurisdiction in his Answer, he immediately thereafter filed a Motion for Judgment on the Pleadings. Importantly, the Motion for Judgment on the Pleadings asks the Court to render a decision on the merits of the lawsuit. As pointed out by Woods himself, the Court has no power to render a merits decision if it lacks personal jurisdiction over the defendant. Therefore, by asking the Court to pass on the merits, Woods voluntarily submitted to the jurisdiction of the Court. *Grable v. Killits*, 282 F. 185, 194 (6th Cir. 1922) (invoking the exercise of the court's jurisdiction by seeking relief on the merits functions as a waiver of lack of personal jurisdiction); *Infogation Corp. v. HTC Corp.*, No. 16-CV-01902-H-JLB, 2017 WL 2869717, at *3 (S.D. Cal. July 5, 2017) (filing a motion for judgment on the pleadings based on merits issues "constitutes a tacit admission on the part of the movant that the court has personal jurisdiction") (quoting *Misch on Behalf of Estate of Misch v. Zee Enterprises, Inc.*, 879 F.2d 628, 631 (9th Cir. 1989)).

Two further points bolster the conclusion that Woods' Motion for Judgment on the Pleadings waived his defenses of insufficient service of process and lack of personal jurisdiction. First, Woods was under no obligation to file either a motion or a responsive pleading at the time

that he did so. His time to respond to the Complaint would have begun to run only once service of process was completed. Fed. R. Civ. P. 12(a). The Court had just granted Boulger an additional 60 days to complete service the day before Woods filed his Answer and Motion for Judgment on the Pleadings. As he would have forfeited nothing by waiting for Boulger to complete service, his reason for filing the Answer and Motion could only be that he desired an early resolution of this case on the merits and was willing to submit to this Court's jurisdiction in order to achieve that early resolution.

Second, Woods has not substantively challenged this Court's jurisdiction over his person. That is, he has given no indication that he would hold a valid personal jurisdiction defense if Boulger had completed service within the time permitted by the Court. His only basis for objecting to personal jurisdiction is the failure of service. (Doc. 20, Reply in Supp. of Mot. for Summ. J. at 5) (noting that Boulger's "failure to properly serve Mr. Woods triggers Mr. Woods' lack of personal jurisdiction defense"). His challenge to personal jurisdiction is therefore is "not of a constitutional dimension" and may be waived more easily. Waiver of Certain Defenses— Rule 12(h)(1), 5C Fed. Prac. & Proc. Civ. § 1391 (3d ed.); *see also King*, 694 F.3d at 659 (it is "relatively easier to find forfeiture of a service defense" than of a defense based on "the fairness of requiring a defendant to appear and defend in a distant forum").

In sum, by filing a Motion for Judgment on the Pleadings on the basis of merits issues, Woods created "a reasonable expectation that [he] will defend the suit on the merits" and waived his defenses of insufficient service of process and lack of personal jurisdiction. Woods's Motion for Summary Judgment, or in the Alternative, Motion for Dismissal is therefore **DENIED**.

## B.      Judgment on the pleadings

Woods seeks judgment on the pleadings on the basis that his tweet, reading "So-called #Trump 'Nazi' is a #BernieSanders agitator/operative?" directly above the two photographs of

Peterson and Boulger, does not constitute a false statement of fact, but a question that invites the reader to reach his or her own conclusions. For this reason, Woods contends, Boulger's Complaint fails to state a viable claim for either defamation or invasion of privacy.

### 1. Standard of review

Woods brings this motion pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." The standard of review for a motion for judgment on the pleadings under Rule 12(c) is the same as that used to address a motion to dismiss under Rule 12(b)(6). *Id.*; *Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007).

Rule 12(b)(6) permits dismissal of a lawsuit for "failure to state a claim upon which relief can be granted." To meet this standard, a party must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A pleading will satisfy this plausibility standard if it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering whether a complaint fails to state a claim upon which relief can be granted, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th Cir. 2012) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663. Thus, while a court is to afford plaintiff every inference, the pleading must still contain facts sufficient to "provide a plausible basis for the claims in the complaint;" a recitation of facts intimating the "mere possibility of misconduct" will not suffice. *Flex Homes,*

*Inc. v. Ritz-Craft Corp of Mich., Inc.*, 491 F. App'x 628, 632 (6th Cir. 2012); *Iqbal*, 556 U.S. at 679.

In sum, "[f]or purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (quoting *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th Cir. 1973)).

### 2.    Defamation

#### a.    Elements of defamation

To prove a claim for defamation under Ohio law, "the plaintiff must show (1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement." *Susan B. Anthony List v. Driehaus*, 779 F.3d 628, 632–33 (6th Cir. 2015) (quoting *Am. Chem. Soc. v. Leadscope, Inc.,* 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, ¶ 77). Failure to establish any one of these elements is fatal to the claim. *Id.*

Woods has challenged only the first of these elements—that is, he contends that his tweet does not constitute a false statement of fact because it merely asks a question that invites his readers to reach their own conclusions. "[I]t is for the court to decide as a matter of law whether certain statements alleged to be defamatory are actionable or not." *Am. Chem. Soc.* at ¶ 78 (quoting *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.,* 6 Ohio St.3d 369, 372, 453 N.E.2d 666 (1983)). Although Ohio case law is scant, the weight of the persuasive authority suggests that in the vast majority of cases, questions will not qualify as statements of fact for defamation purposes.

### b. Whether Woods's tweet is an actionable statement of fact

When determining whether a statement is an assertion of fact, Ohio courts consider the totality of the circumstances, including (1) the specific language used; (2) whether the statement is verifiable; (3) the general context of the statement; and (4) the broader context in which the statement appeared. *Murray v. HuffingtonPost.com, Inc.*, 21 F. Supp. 3d 879, 884–85 (S.D. Ohio 2014) (Frost, J.) (quoting *Bentkowski v. Scene Magazine*, 637 F.3d 689, 693–94 (6th Cir.2011)). In evaluating these factors, "the law charges the author of an allegedly defamatory statement with the meaning that the reasonable reader attaches to that statement"—and not "the perception of the [author]." *McKimm v. Ohio Elections Comm.*, 89 Ohio St. 3d 139, 144–45, 729 N.E.2d 364 (2000). The Court will consider each of these factors in turn.

### i. The specific language used

Under the first factor, this Court must review each alleged actionable statement and "determine whether the allegedly defamatory statement has a precise meaning and thus is likely to give rise to clear factual implications." *Bentkowsk*, 637 F.3d at 694 (quoting *Wampler v. Higgins,* 93 Ohio St.3d 111, 127–28, 752 N.E.2d 962 (2001)). This analysis entails consideration of "the common usage or meaning of the allegedly defamatory words themselves." *Wampler,* 93 Ohio St.3d at 127, 752 N.E.2d 962. Thus, for example, an accusation of a crime would constitute an actionable statement, while indefinite or ambiguous statements would in most contexts not constitute an actionable statement. *Id.* at 128, 752 N.E.2d at 978.

The specific language in this case is a tweet reading "So-called #Trump 'Nazi' is a #BernieSanders agitator/operative?" directly above two photographs: one of Birgitt Peterson wearing a Trump t-shirt and giving the Nazi salute while at a rally for Trump in Chicago, and one of Portia Boulger, accompanied by a caption identifying her as an Organizer for Women for Bernie Sanders. At the outset, the tweet is clearly either a statement or a question regarding

Portia Boulger being the woman in the photograph giving the Nazi salute. The tweet effectively reads, therefore, as "So-called #Trump 'Nazi' is [Portia Boulger,] a #BernieSanders agitator/operative?"[3]

Were it not for the question mark at the end of the text, this would be an easy case. Woods phrased his tweet in an uncommon syntactical structure for a question in English by making what would otherwise be a declarative statement and placing a question mark at the end. Delete the question mark, and the reader is left with an unambiguous statement of fact: "So-called #Trump 'Nazi' is [Portia Boulger,] a #BernieSanders agitator/operative."

But the question mark cannot be ignored. The vast majority of courts to consider questions as potential defamatory statements have found them not to be assertions of fact. Rather, a question indicates a defendant's "lack of definitive knowledge about the issue" and "invites the reader to consider" various possibilities. *Partington v. Bugliosi,* 56 F.3d 1147, 1157 (9th Cir. 1995). "[I]nquiry itself, however embarrassing or unpleasant to the subject, is not accusation." *Chapin v. Knight–Ridder, Inc.,* 993 F.2d 1087, 1093–94 (4th Cir.1993) (while the question "Who will benefit more from the project—GIs or veteran charity entrepreneur Roger Chapin of San Diego and Falls Church, Va., the organizer of the campaign?" was "pointed, and could certainly arouse a reader's suspicion," it could not "reasonably be read to imply the assertion of the false and defamatory fact—pocket lining—of which plaintiffs complain"); *Phantom Touring, Inc. v. Affiliated Publ'ns,* 953 F.2d 724, 730 (1st Cir.1992) (rhetorical question regarding whether plaintiff was "trying to score off the success of Andrew Lloyd

---

[3] Woods argues that his tweet is incapable of a precise meaning because "use of the term 'Nazi' is rhetorical hyperbole that is simply not actionable as a matter of law." (Doc. 7, Mot. for J. on the Pleadings at 6). The cases that Woods cites for this proposition, however, involved referring to individuals as Nazis by analogy (e.g., a "surgery Nazi" or "Little Hitler"). They did not involve questions about individuals being actually supportive of the Nazi movement, as Peterson appears to demonstrate by giving the Nazi salute. The Court does not find the term "Nazi" to be susceptible of multiple meanings in this context.

Webber's 'Phantom'" was not defamatory because it "reasonably could be understood only as [the author's] personal conclusion about the information presented, not as a statement of fact"); *Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1, 15 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015) ("Are the sons of the Palestinian president growing rich off their father's system?" and "Have they enriched themselves at the expense of regular Palestinians—and even U.S. taxpayers?" could not "be read to imply the assertion of objective facts"); *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191, 195–96 (8th Cir. 1994) (the question "Is Beverly Hills Foodland being discriminatory in their hiring practices in the community?" was "not a false statement of fact, nor could it be read as such"; rather "it invites readers to make his or her own inquiry and assess the facts for him or herself" and "must necessarily be characterized as nondefamatory").

That is not to say that questions are automatically insulated from liability for defamation as a matter of law. Many courts, including the Ohio Supreme Court, have recognized the possibility that questions may function as factual assertions depending on the circumstances. *Schoedler v. Motometer Gauge & Equip. Corp.*, 134 Ohio St. 78, 85, 15 N.E.2d 958 (1938) ("A mere insinuation is as actionable as a positive assertion, if the meaning is plain, and it has been held repeatedly that the putting of the words in the form of a question will in no wise reduce the liability of the defendant."). *See also Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993) ("[a] question can conceivably be defamatory, though it must be reasonably read as an assertion of a false fact"); *Beverly Hills Foodland,* 39 F.3d at 195 ("While statements in the form of opinions or questions do not enjoy absolute protection as such, to be actionable such statements must be reasonably read as an assertion of a false fact."); *Abbas*, 783 F.3d at 1339 ("[S]ome commentators and journalists use questions—such as the classic 'Is the President a

crook?'—as tools to raise doubts (sometimes unfairly) about a person's activities or character while simultaneously avoiding defamation liability. After all, a question's wording or tone or context sometimes may be read as *implying* the writer's answer to that question.").

However, the Court has been unable to locate any cases in which a question was determined to be a defamatory statement of fact. While the rule appears to leave room for defamatory questions in theory, courts have been generally unwilling to find liability for questions in practice. *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338–39 (D.C. Cir. 2015) (noting that "posing questions has rarely given rise to successful defamation claims in other jurisdictions").

Moreover, Ohio recognizes an "innocent construction rule" with regard to defamation. That is, "if allegedly defamatory words are susceptible of two meanings, one defamatory and one innocent, the defamatory meaning should be rejected, and the innocent meaning adopted." *McKimm*, 89 Ohio St. 3d at 146, 729 N.E.2d 364 (quoting *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 372, 453 N.E.2d 666 (1983)). Here, the Court can certainly envision a reasonable reader interpreting Woods's tweet as an assertion of fact that Boulger and the woman giving the Nazi salute are the same person. However, it cannot say as a matter of law that *all* reasonable readers would interpret the tweet in that way. The question mark leaves open the real possibility that reasonable readers would interpret the tweet as a mere inquiry signaling Woods's lack of certainty and inviting his followers to reach their own conclusions. Again, while recognizing that questions are not *per se* non-defamatory, the Court shares the District of Columbia Circuit's concerns regarding freedom of speech if actual questions (and not assertions of fact disguised as questions) were subject to liability for defamation. "There is no good or predictable way to neatly divide (i) the questions that are routinely posed in America's robust public forums from

(ii) the kinds of questions that would be actionable as defamation by implication under [the plaintiff's] theory." *Abbas*, 783 F.3d at 1339.

Because the tweet is reasonably susceptible of more than one interpretation, one of which is non-defamatory, the Court finds the specific language used weighs against the tweet being actionable for defamation.

### ii.        Whether the statement is verifiable

The second factor requires the Court to examine whether the statement at issue can actually be verified. This is because, as both the Sixth Circuit and the Ohio Supreme Court have recognized, "if a 'statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content.'" *Bentkowski,* 637 F.3d at 694 (quoting *Scott v. News–Herald,* 25 Ohio St. 3d 243, 251–52, 496 N.E.2d 699 (1986)). Stated otherwise, the Court "seek[s] to determine whether the allegedly defamatory statements are objectively capable of proof or disproof, for 'a reader cannot rationally view an unverifiable statement as conveying actual facts.'" *Wampler*, 93 Ohio St. 3d at 129, 752 N.E.2d 962 (quoting *Ollman v. Evans,* 750 F.2d 970, 981 (D.C. Cir. 1984)).

Here, verifiability depends on which of the two plausible interpretations of the tweet a reader arrives at. If readers understand Woods to be making an assertion of fact—"The person pictured giving the Nazi salute is, in fact, Boulger"—then that assertion is undisputedly verifiable. Indeed, Woods characterizes his tweet as asking his followers to verify that assertion, and various media sources and Peterson herself have disproven it. But if, instead, readers interpret the tweet as Woods asking a question—"Is the person pictured giving the Nazi salute, in fact, Boulger?"—the question itself cannot be proven or disproven because questions, by their nature, lack truth values. Because the Court is required by Ohio law to accept the non-

defamatory interpretation of Woods's tweet as a question, the tweet is not verifiable and this factor also weighs against actionability.

### iii. The general and broader context of the statement

Following the lead of the Sixth Circuit, the Court will analyze together the third and fourth factors, the general context of the statement and the broader context in which the statement appeared. *Bentkowski*, 637 F.3d at 695; *Murray*, 21 F. Supp. 3d at 886. The Ohio Supreme Court has recognized that "[d]ifferent types of writing have . . . widely varying social conventions which signal to the reader the likelihood of a statement's being either fact or opinion." *Bentkowski*, 637 F.3d at 695 (quoting *Scott,* 496 N.E.2d at 708). Thus, the Court "must examine the type of article and its placement in the newspaper and how those factors would influence the reader's viewpoint on the question of fact or opinion." *Id.*

Traditionally, the "general context" of the statement comprises the content of the "entire work at issue," while the "broader context" is "the publication in which the work appears." *Murray*, 21 F. Supp. 3d at 886. Analysis of the former context necessitates examining "more than simply the alleged defamatory statements in isolation, because the language surrounding the averred defamatory remarks may place the reasonable reader on notice that what is being read is the opinion of the writer." *Bentkowski,* 637 F.3d at 695 (quoting *Wampler,* 93 Ohio St.3d at 130, 752 N.E.2d 962). Thus, Ohio law indicates that "courts should assess 'the entire article or column' because 'unchallenged language surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content.'" *Wampler,* 93 Ohio St.3d at 130, 752 N.E.2d 962 (quoting *Ollman,* 750 F.2d at 979). These concepts are easy to apply to articles appearing in newspapers or magazines, the most common setting for defamation claims. Woods's tweet, however, does not map neatly onto a passage from a newspaper article.

Woods suggests that the general context should be defined as "Mr. Woods' Tweets on March 12, 2016, concerning Plaintiff" and the broader context should comprise both Woods's Twitter account as a whole as well as the entire Twitter social media platform. (Doc. 7, Mot. for J. on the Pleadings at 8–10). Boulger argues that the general context should be defined as Woods' Twitter account as a whole, and that the broader context is again the entire Twitter social media platform. (Doc. 9, Mem. in Opp. to Mot. for J. on the Pleadings at 13–16).

The Court has trouble adopting either of these approaches, however, because the nature of a "tweet" is fundamentally different from a statement appearing in the context of a longer written work, which itself appears in the context of a publication containing multiple written works.[4] Each tweet, at the time in question, was limited in length to 140 characters.[5] This is generally sufficient space to express a single coherent thought, but almost certainly insufficient to surround that thought with context and nuance. As each tweet is typically a complete, independent publication, there is no "general context" in the sense provided by the balance of a newspaper or magazine article in which an allegedly defamatory statement appears.

Moreover, most Twitter users do not sit down and read an entire Twitter account in chronological order. More likely, each reader has a feed of Twitter accounts that is updated whenever one of the (perhaps large number of) accounts they follow posts a new tweet. The Twitter feed of a typical user therefore comprises a constantly changing, disjointed series of brief messages on multiple topics by multiple authors. Most users would not see all of Woods's tweets, nor even all of his tweets pertaining to Boulger on March 12, 2016, in one place or at one

---

[4] The following description concerning typical use of Twitter is "not subject to reasonable dispute because it is generally known within the trial court's territorial jurisdiction." Fed. R. Evid. 201(b). The Court therefore considers these facts regarding typical use of Twitter via judicial notice. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 465–66 (6th Cir. 2014).

[5] Twitter recently increased the character limit to 280.

time. While we can logically presume that a reader of a defamatory statement in a newspaper article has read the entire article in which the statement appears, we can make no analogous presumption that a reader of Woods's tweet regarding Boulger has read any other specific tweet.[6] Thus, the other tweets in Woods's account are unlikely to provide the same kind of context that the surrounding language in a newspaper article would.[7]

A further difficulty with Twitter accounts is that each is unique in tone and content. Many established news reporting outlets maintain Twitter accounts for the very purpose of reporting the news. An individual Twitter user may use his or her account to bring attention to particular facts and news stories; another, to share personal opinions about those new stories; another, to engage in political satire; another, to post personal anecdotes; and so on. Others may engage in a combination of these activities. As a result, a reader cannot tell anything about whether a particular Twitter account is likely to contain reporting on facts, versus personal opinion or rhetorical questions, from the mere fact that the author uses of Twitter as his or her preferred communication medium.

But the Court must still analyze whatever surrounding circumstances are available to the reader to evaluate whether a tweet presents an assertion of fact, even if they do not precisely correspond to the framework developed for newspapers and magazines. So what contextual information *was* available to a typical reader of Woods's tweet? For one, the author of the tweet is identified as "James Woods," with twitter username "@RealJamesWoods," and with a

---

[6] This is why Woods's reliance on his later tweet on March 12, that "[v]arious followers have stated that the Nazi Salute individual and the #Bernie campaign woman are NOT the same person," is at least partially misplaced. At the time of the original tweet suggesting Boulger may be the "Trump Nazi," the second, clarifying tweet was not yet in existence and could not have provided context for early readers of the original tweet.

[7] That is not to say that other tweets from the same account can never provide relevant context. For instance, many Twitter users have adopted a convention of labeling their tweets with, e.g., "1/4," to indicate the first of four related tweets. Other users frequently use a screenshot of, or a link to, a previous tweet when a later tweet is related. But there is no indication that Woods's original "Trump Nazi" tweet was contextualized in this way.

headshot of Woods as the account's profile picture. (Doc. 9-1, screenshot). The Ohio Supreme Court has stated that "[t]he author's reputation" should be considered in evaluating the context of an allegedly defamatory statement. *Vail v. The Plain Dealer Publ'g Co.*, 72 Ohio St. 3d 279, 282, 649 N.E.2d 182 (1995). In *Vail*, the author's reputation as "an opinionated columnist" weighed in favor of classifying the statement in question as opinion rather than a statement of fact. *Id.*

As Boulger acknowledged in her complaint, Woods is "a well-known movie actor and producer." (Doc. 1, Compl. ¶ 2). As a well-known actor and producer, Woods likely has a reputation among his readers. Unfortunately, there is no evidence in the pleadings as to Woods's reputation that would assist the Court. Woods asserts that a personal Twitter account, such as his, is unlikely to be "normally engaged in the business of factual reporting or news dissemination." (Doc. 7, Mot. for J. on the Pleadings at 10) (quoting *Wampler,* 93 Ohio St.3d at 132, 752 N.E.2d 962). But as discussed above, personal Twitter accounts can be used for all sorts of purposes, including news dissemination.

Additionally, the tweet concerned and was posted during a highly-contentious political campaign for U.S. president. The Ohio Supreme Court noted in *Vail* that the allegedly defamatory statement in question was published "in the midst of a political campaign, which provided the subject for the column." 72 Ohio St. 3d 279, 282, 649 N.E.2d 182. Woods argues that this statement from *Vail* weighs against his tweet being an assertion of fact. But this cannot be *Vail*'s logical implication, and the Court does not read *Vail* to suggest as much. True, political campaigns give rise to much opinion and rhetoric, but they also give rise to much factual reporting and news dissemination. That a statement was made about and published

during a political campaign cannot by itself be evidence that the statement is or is not an assertion of fact.

In sum, the Court is unable to clearly define the parameters of the "general" or "broader" context of an allegedly defamatory statement made on Twitter. The Court is also unable to say that the general or broader context of Woods's tweet weighs either for or against classifying the tweet as a statement of fact. But given that the first two factors were both answered in the negative, the Court finds that the totality of the circumstances dictate that at least some reasonable readers of Woods's tweet would interpret it as a question and not a statement of fact. Therefore, under Ohio's innocent construction rule, Woods's tweet is protected by the Ohio Constitution and is not actionable. *Bentkowski*, 637 F.3d at 696. Accordingly, Woods's Motion for Judgment on the Pleadings as to Boulger's defamation claim is **GRANTED**.

### 3. Invasion of privacy

Ohio recognizes a tort for false light invasion of privacy:

> one who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Murray*, 21 F. Supp. 3d at 884 (quoting *Welling v. Weinfeld*, 113 Ohio St. 3d 464, 2007-Ohio-2451, 866 N.E.2d 1051, ¶ 61). Woods challenges both elements by arguing that (a) Woods's tweet would not place Boulger in a highly offensive light, and (b) Woods's tweet was a question incapable of verification and therefore could not place Boulger in a "false" light. (Doc. 7, Mot. for J. on the Pleadings at 11–12; Doc. 14, Reply in Supp. of Mot. for J. on the Pleadings at 8–9).

As to the first element, the Court has no trouble concluding that Woods's tweet would be highly offensive to a reasonable person in Boulger's position. Even positing the possibility that

Boulger was pictured giving the Nazi salute at the Trump rally in Chicago comes close to directly accusing her of

> making this hideous gesture in an effort to associate herself with the Nazi movement, falsely, in order to make it seem as if Nazi sympathizers had attempted a Trump rally. Such conduct would clearly be horrendous and deserving of severe condemnation, regardless of what one thought of Trump. That would be particularly true were the perpetrator actually a leader of a major Bernie Sanders support group.

(Doc. 9, Mem. in Opp. to Mot. for J. on the Pleadings at 18). Woods's contention that a reasonable person would not be highly offended by even the mere suggestion that one had engaged in such conduct (even absent a direct accusation) is disingenuous at best.

However, as noted by the *Welling* court, "[f]alse-light defendants enjoy protections at least as extensive as defamation defendants" and the elements of the claim "make a false-light claim difficult to prove." *Welling* at ¶¶ 58, 51. And, just as with Bougler's claim for defamation, her claim for false light invasion of privacy requires Woods to have made a false statement of fact. *Id.* at ¶ 52; *Roe ex rel. Roe v. Heap*, 10th Dist. Franklin No. 03AP–586, 2004-Ohio-2504, ¶ 106 (no cognizable false light invasion of privacy claim where "statements forming the basis for the alleged invasion of privacy were . . . constitutionally protected statements of opinion not susceptible of a determination as to their truth or falsity.")

As explained *supra*, Woods's tweet is capable of being reasonably interpreted as a question, which is "not susceptible of a determination as to [its] truth or falsity." *Roe* at ¶ 106. For this reason, the tweet is not actionable under a false light invasion of privacy cause of action. Accordingly, Woods's Motion for Judgment on the Pleadings as to Bougler's claim for false light invasion of privacy is **GRANTED**.

## IV.    CONCLUSION

For the foregoing reasons, (1) Woods's Motion for Summary Judgment, or in the Alternative, Motion for Dismissal is **DENIED** and (2) Woods's Motion for Judgment on the Pleadings is **GRANTED.**

The Clerk shall remove Documents 7 and 16 from the Court's pending motions list and close this case.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**